**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HENROB LIMITED,

    Plaintiff/Counter-Defendant,

v.                                                                  Case No. 05-CV-73214-DT

BÖLLHOFF SYSTEMTECHNICK GMBH & CO.
and BÖLLHOFF RIVNUT, INC.,
BAYERISCHE MOTOREN WERKE AG, BMW NA,
ROLLS-ROYCE MOTOR CARS LTD,
and ROLLS-ROYCE NA,

    Defendants/Counter-Plaintiffs.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO HENROB'S CLAIM OF WILLFUL INFRINGEMENT**

This litigation involves U.S. Patent No. 5,752,305 (the "'305 Patent"), which deals with the self-piercing riveting technology invented by Plaintiff/Counter-Defendant, Henrob Limited ("Henrob"). On October 25, 2006, the court issued an order pursuant to *Markan v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996), construing the two patents. Now before the court is a motion for summary judgment with respect to Henrob's Claims of Willful Infringement, filed on September 15, 2008 by Defendants/Counter-Plaintiffs, Böllhoff Systemtechnik GmbH & Co., and Böllhoff Rivnut, Inc., (collectively "Böllhoff") and Defendants Bayerische Motoren Werke AG, BMW NA, Rolls-Royce Motor Cars Ltd., and Rolls-Royce NA (collectively "BMW"). The motion has been fully briefed, and the court has concluded

that no further hearing on this motion is necessary.[1]  See E.D. Mich. LR 7.1(e)(2).  For the reasons set forth below, the court will grant the motion.

## I.  BACKGROUND[2]

Defendant Bayerische Motoren Werke AG ("BMW AG") is a German corporation with its principal place of business in Munich, Germany.  (Undisputed Fact # 1.)  BMW AG uses Böllhoff self-piercing riveting ("SPR") machines in its manufacturing facility in Dingolfing, Germany to assember certain BMW vehicles and body shells for incorporation in Rolls-Royce vehicles.  (Undisputed Fact # 2.)  Defendant BMW of North America, LLC ("BMW NA") is a Delaware limited liability company with its principal place of business in Woodcliff Lake, New Jersey.  (Undisputed Fact # 3.)  It purchases in Germany BMW vehicles manufactured by BMW AG, imports those vehicles into the United States, and sells them to authorized BMW dealers in the United States.  (*Id.*)  Defendant Rolls-Royce Motor Cars, Ltd. ("Rolls-Royce Ltd.") is a British corporation organized and existing under the laws of England and Wales with its principal place of business in West Sussex, United Kingdom.  (Undisputed Fact # 4.)

Rolls-Royce Ltd. manufactures Rolls Royce vehicles in its manufacturing facility in Goodwood, United Kingdom.  (*Id.*)  The manufacture of the vehicles includes incorporation of body shells manufactured by BMW AG at its Dingolfing, Germany

---

[1]The court conducted a hearing in this case on December 19, 2008, at which time the court allowed counsel an opportunity to comment on this motion.  (*See* 12/15/08 Order.)

[2] Except where otherwise noted, the undisputed facts were proffered by Defendants and admitted by Henrob.  Where a party admitted a proffered fact, but qualified it in some way, the court has included the fact as "undisputed" to the extent that the qualification allows.

facility. (*Id.*) Defendant Rolls-Royce Motor Cars NA, LLC ("RRNA") is a Delaware limited liability company with its principal place of business in Woodcliff Lake, New Jersey. (Undisputed Fact # 5.) It purchases in the United Kingdom vehicles manufactured by Rolls-Royce Ltd., imports them into the United States, and sells them to authorized Rolls-Royce dealers in the United States. (*Id.*) Defendant Böllhoff Systemtechnik GmbH & Co KG ("Böllhoff Germany") is a company based in Bielefeld, Germany, and Defendant Böllhoff Rivnut, Inc. ("Böllhoff US") is a company based in Indiana. (Undisputed Fact # 6.) Böllhoff Germany and Böllhoff US are collectively referred to as "Böllhoff."

Plaintiff Henrob Limited ("Henrob") is a company based in Flintshire, United Kingdom that manufactures SPR equipment and rivets. (Undisputed Fact # 7.) During the 1990's Defendant Böllhoff Germany was an authorized distributor of Henrob. During this time period, BMW AG purchased from Böllhoff Germany SPR machines and rivets that were manufactured by Henrob. (Undisputed Fact # 8.) Henrob attests that Böllhoff ceased being a distributor of Henrob products as of December 31, 1999, and Defendants attest that Böllhoff ceased being a distributor of Henrob products as of January 1, 2000. (Fact # 9.)

The patent at issue in this litigation, United States Patent 5,752,305 (the "305 Patent"), was issued on May 19, 1998. (Fact # 10.) On March 13, 2003, Böllhoff filed a request for re-examination of the '305 Patent with the United States Patent and Trademark Office. (Fact # 11.) The USPTO issued a reexamination certificate for the '305 Patent on April 19, 2005. (*Id.*)

On March 22, 1999, Roger Doo of Henrob attended a meeting at BMW AG in Munich, Germany. In attendance on behalf of BMW AG and its subsidiary Rover Group were Patrick Grüßenbeck, Peter Niedenzu, Dieter Schubert, Thomas Cohnen, Martin Steininger, and Franz Stierstorfer.[3] (Fact # 15.) During that meeting, Mr. Doo presented a slide containing general information about Henrob. (Fact # 16.) The slide contained seven bullet points with some additional sub-bullet points, and Mr. Doo's presentation followed the bullet point in the order they appeared on the slide. (*Id.*) The first bullet point addressed the Henrob-Böllhoff Germany relationship. (Undisputed Fact # 17.) It said: "Sales of Henrob tape system products through Böllhoff GmbH will end 31.12.99 (for all mainland Europe & UK)." (*Id.*) When addressing this point, Mr. Doo told the meeting participants that during the 1990s, the product purchased by BMW AG from Böllhoff had been manufactured by Henrob and that if BMW AG "wanted to carry on taking that same product from Henrob, it would not be possible to obtain it via Böllhoff from the date 31st December, 99." (*Id.*)

The fourth bullet point in the slide presentation addressed "Relevant Patents." (Undisputed Fact # 18.) In sub-bullet point referring to "Pre-clamping technology," the slide said "gives 4X joint fatigue performance" and "ONLY available from Henrob." (*Id.*) Mr. Doo said to the meeting participants what was written on the slide - *i.e.,* that Henrob's pre-clamping technology gives four times joint fatigue performance. (*Id.*) Mr.

---

[3]The parties agree that Karl-Otto Stromberg of a Swedish company called FlexProp AB was also in attendance. (Undisputed Fact # 15.) Defendants proffer, but Henrob disputes, that "the main topic of the meeting focused on a light-weight C-frame manufactured by Flex-Prop that was distributed by Henrob for use in SPR applications. (Def.'s Fact # 15.)

4

Doo also told the meeting participants that pre-clamping technology was patented, only available from Henrob, and that he had a handout that would explain why that was the case. (*Id.*)

Another bullet point on the slide states that a particular rivet called the "C rivet" is an "ideal rivet design for joining aluminum with pre-clamping technology." (Undisputed Fact # 19.) In addressing this point, Mr. Doo told the meeting participants that the combination of the C rivet and pre-clamping were significant to customers like BMW AG because enhanced fatigue performance was obtainable. (*Id.*) At the conclusion of his presentation, Mr. Doo provided to the meeting participants a hand-out that included a document entitled "Intellectual Property Statement." (Undisputed Fact # 20.) Before handing it out, Mr. Doo briefly explained the contents by saying that Henrob had intellectual property rights on pre-clamping technology, including the riveting process, the die, and the tool and that the patents were in a number of countries. (*Id.*) He also said he would be handing out copies of some of the patent material such as a copy of the patent abstract. (*Id.*) After Mr. Doo's presentation, there was a question-and-answer session during which Mr. Doo discussed the advantage of pre-clamping technology in minimizing distortion. (Undisputed Fact # 22.)

On April 23, 2001, Henrob representatives gave a presentation to BMW AG employees at BMW AG's Munich, Germany offices. (Undisputed Fact # 23.) During the meeting, Henrob representatives told the participants that the pre-clamping patent claims (which Henrob asserts did not refer to the '305 Patent) had been reduced after a judicial proceeding. (Def.'s Fact # 24, Pl.'s Fact # 24.) Mr. Niedenzu's contemporaneous notes of the meeting indicate "Clamping Device Patent: Negotiation:

Claims reduced and canceled." (Undisputed Fact # 24.) Other patents were also discussed at the meeting. (Undisputed Fact # 26.) For example, the minutes of the notes reference a patent for a standard feeding mechanism for an SPR machine. The minutes state that "Henrob reports that this patent remains valid. Imitations should not be sold," and Mr. Niedenzu's notes report: "Valid as before; imitations should not be sold. Not permissible." (*Id.*)

The Henrob representatives said that BMW AG would be infringing the feeding mechanism patent by purchasing feeding mechanisms from Böllhoff for its SPR machines. (Undisputed Fact # 27.) They did not say anything about infringement of the pre-clamping patent. (*Id.*) The Henrob presentation left the BMW AG meeting participants with the impression that the pre-clamping patent was of doubtful validity and of no concern to BMW AG, as opposed to the feeding mechanism patent, which Henrob said was of concern. (*Id.*) Henrob asserts in its counter-facts that "the referenced 'pre-clamping patent' is not the '305 Patent." (Pl.'s Fact # 27.)

After the April 23, 2001 meeting, Mr. Niedenzu contacted Helmut Bücken, a patent attorney in the BMW AG legal department, about Henrob's allegation of potential infringement of the feeding mechanism patent, European Patent 0 172 171 (the "EP '171 Patent"). (Undisputed Fact # 28.) In response to the notification from Mr. Niedenzu, Mr. Bücken began a series of communications with Henrob and Böllhoff concerning the allegations of infringement regarding the EP '171 Patent. (*Id.*) In response to Mr. Bücken's inquiry, Böllhoff told BMW AG by letters dated June 26, 2001 and July 24, 2001, that (1) for machines that it had purchased from Böllhoff while it was a Henrob supplier, BMW AG should order spare parts related to the feeding mechanism

6

cover by the EP '171 Patent directly from Henrob rather than from Böllhoff; (2) Böllhoff had developed a new feeding mechanism that did not infringe the EP '171 Patent. (Undisputed Fact # 30.)  In response BMW AG purchased directly from Henrob spare parts associated with the EP '171 Patent for machines already purchased from Böllhoff. (*Id.*)

On June 28, 2001, in response to a request from BMW AG, Böllhoff executed a declaration of indemnification in which Böllhoff agreed to indemnify BMW AG for any claims of infringement of any patents relating to purchases of any products from Böllhoff.  (Undisputed Fact # 31.)  Defendants contend that "[t]he willingness of Böllhoff to give such a broad indemnification agreement caused BMW AG to believe that Böllhoff did nto believe there was any cause for concern about infringement of any patents . . ."  (Defs.' Fact # 31.)

Also in 2001, BMW AG decided to purchase a substantial number of SPR machines for use in assembling new BMW vehicles.  (Undisputed Fact # 32.)  BMW AG decided to purchase approximately 50% of its needs – over 100 machines – from Böllhoff.  (*Id.*)  The other 50% of its needs came from a company called Tucker, which provided machines with a blow feed mechanism instead of the standard tape feed mechanism.  (Undisputed Fact ## 32-34.)  Defendants contend that lateral material flow was not a consideration in BMW AG's decision as to which company to recommend as a supplier, nor had lateral inward material flow ever been a focus of BMW AG's attention prior to the filing of this litigation.  (Defs.' Fact # 34.)  Henrob disputes this contention.  (Pl.'s Counter Fact # 34.)

7

On July 16, 2001, Böllhoff executed a contract with BMW AG setting forth terms and conditions for any order from Böllhoff. (Undisputed Fact # 35.) Section 14.1 of the contract states that "[t]he contractor ensures that the services supplied by him are free of protective rights of third parties which exclude or impair their use by BMW, or that he is authorized to further assign the relevant rights of use." (Pl.'s Fact # 36.)

In the summer of 2004, Mr. Pilgrim of Henrob had some conversations with Marc Reinstettal of BMW AG after learning that Böllhoff had been selected to supply SPR machines for the assembly of the new BMW X5 vehicles (the "E70 Project"). (Undisputed Fact # 37.) Mr. Pilgrim brought the pre-clamping patent to Mr. Reinstettal's attention as a means of trying to steer this project back to Henrob. (*Id.*) In response, Mr. Reinstettal brought matter to Böllhoff's attention who, according to Defendants, assured BMW AG that there were no infringement problems. (Defs.' Fact # 37.) In a September 13, 2004 email authored by Mr. Pilgrim, Pilgrim reports that Mr. Reinstettal had asked Böllhoff for a statement as it "seems to be the case that Böllhoff uses the HENROB pre-clamping technology" and that Böllhoff answered by stating that "they don't see a problem but guarantee that if they are infringing they will change to spring pre-clamping cost-free for BMW." (Pl.'s Fact # 37, Defs.' Ex. 22.) On September 2, 2004, BMW AG purchasing department issued an Order Recommendation, recommending the purchase of Böllhoff SPR machines for the E70 Project. (Undisputed Fact # 38.)

On March 15, 2005, Henrob's patent counsel in Germany contacted the BMW AG legal department to inform BMW AG that it was Henrob's position that Böllhoff had infringed the '305 Patent through its sale of machines to BMW AG. (Fact # 39.) There

8

followed an exchange of correspondence between Henrob's German counsel and BMW AG in an effort to set up a meeting. (*Id.*) The correspondence included an e-mail on April 5, 2005 from Henrob's counsel to BMW AG asserting that BMW AG had infringed the '305 Patent by allegedly importing into the United States cars assembled with SPR machines purchased from Böllhoff.[4] (*Id.*)

In response to this communication, on April 28, 2005, BMW AG revoked the technical approval of Böllhoff to sell Henrob SPR machines to BMW AG, and changed its purchase recommendation for its E70 and F01 vehicle projects from Böllhoff to Tucker. (Undisputed Fact # 40.) On May 11, 2005, representatives from Henrob and BMW AG held a meeting, during which BMW AG informed Henrob that they had canceled existing plans to purchase new Böllhoff SPR machines. (Undisputed Fact # 41.) BMW AG asked for a letter to give to Böllhoff setting forth Henrob's infringement allegations. (*Id.*) Henrob provided a letter to BMW AG on May 12, 2005 for the purpose of enabling BMW AG to bring Henrob's allegations against BMW AG to Böllhoff's attention. (*Id.*) This letter contained Henrob's "formal notification" to BMW AG that BMW cars manufactured using Böllhoff SPR machines and purportedly imported into the United States were allegedly infringing the '305 Patent and that legal proceedings in the United States against BMW AG were being contemplated. (*Id.*)

On May 20, 2005, Böllhoff commenced this lawsuit by filing a complaint in the United States District Court for the Northern District of Illinois (the "Böllhoff Action").

---

[4]The parties disputed whether this email was the first allegation of BMW AG's infringement. Henrob contends that Mr. Doo had made it clear during the 1999 meeting that if BMW purchased Böllhoff's machines that used the '305 Patent then it would be potentially infringing the '305 Patent. (Pl.'s Fact # 39.)

9

(Undisputed Fact # 42).  The complaint sought a declaratory judgment that the Böllhoff SPR machine and products imported into the United States that were manufactured with the Böllhoff SPR machine, including BMW vehicles, did not infringe the '305 Patent, that the method of using Böllhoff SPR machines did not infringe the '305 Patent, and that the '305 Patent is invalid.  (*Id.*)  Several months of unsuccessful discussions to determine whether the Henrob, Böllhoff and BMW AG could amicably resolve the dispute followed.  (Undisputed Fact # 43).

On October 17, 2005, Henrob filed a complaint against BMW AG, BMW NA, Rolls-Royce Ltd., and RRNA in the United States District Court for the Eastern District of Michigan, alleging infringement of the '305 Patent (the "Henrob Action").  (Undisputed Fact # 44).  On June 29, 2006, Henrob filed its First Amended Complaint against the BMW Defendants, which is the most recent complaint against the BMW Defendants. (*Id.*)  The Böllhoff Action was transferred to the United States District Court for the Eastern District of Michigan on August 19, 2005.  (Undisputed Fact # 48.) On March 7, 2006, this court consolidated the Henrob Action and the Böllhoff Action into a single proceeding (the "Consolidated Action").   (*Id.*)

On October 25, 2006, the court issued its *Markman* decision in the Consolidated Action. (Undisputed Fact # 49).  On March 23, 2007, the Defendants in the Consolidated Action moved for summary judgment of noninfringement.  (Undisputed Fact # 50).  After limited discovery, the matter was fully briefed on November 12, 2007.  The motion was denied in an Opinion and Order entered on November 30, 2007.  (*Id.*)

In 1999 and 2000, Böllhoff obtained two opinions from patent counsel regarding the invalidity of the '305 Patent or infringement of the '305 Patent by the Böllhoff SPR

10

machine and by Böllhoff's customers that use the Böllhoff SPR machine. (Undisputed Fact # 52.) Defendants contend that these opinions state, in part, that the claims of the '305 Patent are invalid over prior art (the AI Article). (Defs.' Fact. # 52.) Henrob disputes that the August 4, 1999 opinion of counsel states that the claims of the '305 Patent are invalid over prior art. (Pl.'s Fact # 52.)

In 2001, based on an opposition proceeding initiated by Böllhoff and others, the European Patent Office (EPO) rejected Henrob's claims in EPO patent no. 0675774, which was Henrob's EPO patent equivalent to the '305 patent. (Undisputed Fact # 53). After the EPO rejected the claims of Henrob's EPO patent over the AI Article, Henrob amended the claims to overcome the EPO's rejection. (*Id.*) When the USPTO decided to reexamine the claims of the '305 Patent, the USPTO stated: "It is agreed that the consideration of the AI Article . . . raises a substantial new question of patentability as to . . . claims [1-15]" of the '305 patent." (Undisputed Fact # 54 (citing USPTO Order 5/30/2003).) During the reexamination proceeding for the '305 Patent, the USPTO rejected method claims 1-5 and 8 and machine claims 9-12, 14 and 15 that existed in the '305 Patent as being unpatentable over the AI Article. (Undisputed Fact # 55). During the reexamination proceeding, Henrob amended Claim 1 to overcome the USPTO's rejection of the claim over the AI Article. (*Id.*) Henrob also added a new claim 16 during the reexamination proceeding of the '305 Patent. (*Id.*)

In 2004 and 2005, Böllhoff had scientific tests and studies conducted to determine whether or not the Böllhoff SPR machine could prevent inward, lateral material flow. (Fact # 56). Böllhoff avers that each of these studies and tests concluded that the Böllhoff SPR machine could not prevent inward, lateral material flow.

(Böllhoff Fact # 56). Henrob disputes these conclusions. (Pl.'s Fact # 56). Henrob did not conduct any tests of a Böllhoff SPR machine to ascertain if it infringed claims of the '305 Patent until after Böllhoff commenced this lawsuit. (Undisputed Fact # 57).

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough

evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

### III.  DISCUSSION

In this litigation, Henrob asserts that Defendants are liable for willful infringement of the '305 Patent. Defendants' current motion argues that summary judgment should be granted in their favor because Henrob has not raised any genuine issue of material fact that would support a finding of willful infringement of a valid patent under the standard established in *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

Proof of willful infringement requires a showing of objective recklessness:

> "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent . . . . The state of mind of an accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."

*Seagate,* 497 F.3d at 1371.

Thus, a review of Defendants' motion for summary judgment focuses upon two inquires: (1) whether there is a triable issue regarding the existence of an objectively high likelihood that Defendants' actions with respect to Böllhoff's SPR machines constituted infringement of the '305 Patent and, if so, (2) whether this objectively

defined risk was either known or so obvious that it should have been known to Defendants.

In their motion and reply brief, Defendants argue that in light of the reasonableness of their non-infringement position, there is no clear and convincing evidence of an objectively high likelihood of infringement of the '305 Patent. (Defs.' Mot. at 15.) Specifically, Defendants emphasize this court's acknowledgment in its order denying Defendants' summary judgment motion on the issue of infringement, that their non-infringement arguments are "persuasive." (*Id.*) Defendants also contend that scientific testing of the Böllhoff's SPR machine, Henrob's interrogatory responses served at the close of discovery and the reexamination proceedings regarding the '305 Patent before the USPTO demonstrate that Henrob cannot establish the requisite objectively high likelihood of infringement necessary to support a willfulness contention. (*Id.* at 26-29.)

First, the court agrees with Defendants that Henrob's evidence, as well as their argument in their response brief, focuses primarily on the subjective prong of the *Seagate* test. In their motion for summary judgment, Defendants contend that Henrob's interrogatory responses acknowledge that Henrob has no "objective" proof because the responses show only "mere knowledge of a patent," which is not enough to support a willfulness finding. (Defs.' Mot. at 28.) Henrob argues in its response brief that Defendants improperly characterize their interrogatory responses by neglecting to identify all of the evidence and information referenced in the responses. (Pl.'s Resp. at 5.) Although Defendants did not specifically identify references to testimony and depositions in their characterization of Henrob's interrogatory responses, Defendants

have accurately asserted that the responses address communications between Defendant BMW AG and Henrob, the BMW Defendants' lack of an opinion of counsel addressing Henrob's infringement allegation, references to Defendant Bollhoff's knowledge of the '305 Patent, and communications between Henrob and Bollhoff.  As such, Henrob's interrogatory responses, which may very well lend support to Henrob's position that Defendants knew or should have known of the alleged infringement, are not relevant to the inquiry of whether an objectively high likelihood of such infringement existed.  Henrob's interrogatory responses therefore do not present a genuine issue of material fact with respect to the first prong of the *Seagate* test.

     Moreover, the court agrees with Defendants that prior orders of the court demonstrate that Henrob cannot show an objectively high likelihood of infringement of a valid patent.  Defendants accurately state that this court, in its November 30, 2007 order reviewing their motion for summary judgment of non-infringement, noted that their arguments were "persuasive."  Specifically, the issue before the court at that time was whether Henrob's expert reports were so deficient that they could not rebut Defendants' own expert reports of noninfringement.  (11/30/09 Order.)  The court remarked that it was "in the tenuous position of evaluating the substance of the parties' competing evidence to determine whether a reasonable jury could find in favor of Henrob."  (*Id.* at 7.)  Placed in this position, the court concluded that summary judgment was improper where competing expert reports reached differing opinions.  However, in denying Defendants' summary judgment motion, the court stated, in part, "[w]hile the court finds Defendants' arguments persuasive to challenge Henrob's conclusions and attack Dr. Hu's credibility, the court cannot find that Henrob's tests are so inherently flawed that

they are inadmissible." (*Id.* at 9.) The court also noted that Defendants may be able to persuade a jury that their expert tests were more efficient than, or "preferable" to, Henrob's expert tests, but found, ultimately, that Defendants argument went to the weight, not the admissibility of Henrob's expert opinions. (*Id.*) Given that the court was examining Defendants' motion for summary judgment, and therefore required to view the evidence in a light most favorable to Henrob, the court found no necessity of commenting extensively on the quality of the parties' evidence. It was enough to find that Henrob's evidence was sufficient to withstand a summary judgment motion. Defendants are correct, however, to the extent that they detected a certain undercurrent in the order which, perhaps, revealed the court's skepticism as to the strength of Henrob's evidence.

Additionally, after the briefing was completed on the instant motion, the court issued its opinion and order denying Defendants motion for summary judgment on invalidity. As with the court's decision with respect to infringement, the court denied summary judgment but commented, in passing, on certain difficulties Henrob may face at trial. (12/23/08 Order at 15-16, n.6 (noting that "Defendants' arguments regarding the Doo tests are legitimate bases for cross-examination"); 17 (finding Henrob's argument "a bit contradictory" but viewing "[a]ny ambiguity, at the summary judgment stage, in favor of Henrob); 20, n.9 (noting that Defendants will attempt to "discredit" one of Henrob's test, but concluding that a reasonable jury could rely upon them); 23 ("While the court acknowledges that Dr. Hu's generalized conclusions do not constitute an overwhelming amount of evidence, they are more than a scintilla and, given Defendants' high burden, they are enough to survive summary judgment.").

Both the court's November 30, 2007 summary judgment order on infringement and its December 23, 2008 summary judgment on invalidity reflect a similar tone. In both opinions, the court found, after viewing the presented evidence in a light most favorable to Henrob, that Henrob had produced sufficient evidence to create a triable issue of fact with respect to infringement and invalidity. However, the court noted in both opinions that Defendants had ample competing evidence to present to the jury or to use to cross-examine Henrob's witnesses. Implicit in the orders is the court's view that, while Henrob could avoid summary judgment, Defendants' arguments were valid.

Following *Seagate*, the Federal Circuit has stated that "[u]nder this objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F. App'x 284, 291 (Fed. Cir. 2008). Here, Defendants have demonstrated, both in this motion as well as their previous motions for summary judgment, that they have *both* legitimate defenses to infringement claims as well as credible invalidity arguments. In light of the facial validity of Defendants' positions, the court finds as a matter of law that Henrob will be unable to convince a reasonable jury by clear and convincing evidence of the existence of objectively high likelihood that Defendants' actions constituted infringement of a valid patent.

This is not to say that the court accepts Defendants' argument that because Henrob did not move for summary judgment on these issues, it implicitly recognized the reasonableness of Defendants' positions. Recognizing the existence of a triable issue of fact is not the same as concluding that the objective prong of *Seagate* cannot be met.

Rather, it is not simply the competing facts here, but the strength of Defendants' arguments. The Federal Circuit has recently expressed a similar holding:

> While the fact that an issue was submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement, the record developed in the infringement proceeding in this case, viewed objectively, indisputably shows that the question of equivalence was a close one, particularly insofar as equivalence "requires an intensely factual inquiry."

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1337 (Fed. Cir. 2009) (quoting *Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000)). Even if Henrob eventually proves infringement and Defendants fail to show the '305 Patent is invalid, the cogency of Defendants' arguments precludes Henrob from showing by clear and convincing evidence an objectively high likelihood of infringement of a valid patent. *See id.* (finding that "the district court was correct to rule on JMOL that an objectively high likelihood of infringement could not have been found under Seagate's first prong" notwithstanding the "fact that the jury ultimately found equivalence"); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 533 F. Supp. 2d 397, 420 (S.D.N.Y. 2008) ("While Lansa was ultimately unsuccessful in defending against infringement or proving invalidity with regard to the '075 Patent, its arguments in these areas were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon."); *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 579 (E.D. Tex. 2007) ("Even though AT & T ultimately did not prove its invalidity defense by clear and convincing evidence, its position was hardly objectively unreasonable.").

Accordingly, the court finds that Henrob has proffered insufficient evidence on which a reasonable jury could find by clear and convincing evidence that Defendants "acted despite an objectively high likelihood that [their] actions constituted infringement of a valid patent." *Seagate,* 497 F.3d at 1371. Inasmuch as Henrob cannot meet this threshold standard, the court need consider whether Henrob can meet *Seagates*'s second prong, whether any "objectively defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.*

Defendants' summary judgment motion will therefore be granted and Henrob will not be entitled to enhanced damages. *DePuy Spine, Inc.*, 567 F.3d at 1337 ("[B]ecause 'an award of enhanced damages requires a showing of willful infringement,' *Seagate*, 497 F.3d at 1368 (citing *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed.Cir. 1991)), [the plaintiff] is not entitled to enhanced damages.").

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Defendants' "Motion for Summary Judgment with Respect to Henrob's Claims of Willful Infringement" [Dkt. # 206] is GRANTED.

 S/Robert H. Cleland  
ROBERT H. CLELAND  
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2009, by electronic and/or ordinary mail.

 S/Lisa Wagner  
Case Manager and Deputy Clerk  
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\05-73214.HENROB.WillfulInfringement.GrantSJ.chd.wpd