**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

HENROB LIMITED,

        Plaintiff/Counter-Defendant,

v.                                 Case No. 05-CV-73214-DT

BÖLLHOFF SYSTEMTECHNICK GMBH & CO.
and BÖLLHOFF RIVNUT, INC.,
BAYERISCHE MOTOREN WERKE AG, BMW NA,
ROLLS-ROYCE MOTOR CARS LTD,
and ROLLS-ROYCE NA,

        Defendants/Counter-Plaintiffs.

_____/

**OPINION AND ORDER GRANTING HENROB'S MOTION FOR SUMMARY
JUDGMENT ON THE BÖLLHOFF DEFENDANTS' CLAIM FOR UNFAIR
COMPETITION**

      This litigation involves two patents, U.S. Patent No. 5,752,305 (the "'305 Patent")

and U.S. Patent No. 5,779,127 (the "'127 Patent"), which deal with the self-piercing

riveting technology invented by Plaintiff/Counter-Defendant, Henrob Limited ("Henrob").

Now before the court is Henrob's motion for summary judgment against

Defendants/Counter-Plaintiffs, Böllhoff Systemtechnik GmbH & Co., and Böllhoff Rivnut,

Inc., (collectively "Böllhoff" or the "Böllhoff Defendants") with respect to the Böllhoff

Defendants' claim for unfair competition.[1] The motion has been fully briefed, and the

_____

[1] Defendants Bayerische Motoren Werke AG, BMW NA, Rolls-Royce Motor Cars Ltd.,
and Rolls-Royce NA (collectively "BMW") are not a party to the instant motion.

court has concluded that no further hearing on this motion is necessary.[2]  *See* E.D.

Mich. LR 7.1(e)(2).  The court will grant the motion.

## I. BACKGROUND[3]

Throughout the 1990s, Böllhoff acted as Henrob's exclusive distributor of self-

piercing riveting ("SPR") products.  (Undisputed Fact # 1.)  In 1998, The U.S. Patent

Office issued the '305 Patent and the '127 Patent to Henrob.  The distribution

arrangement ended either on December 31, 1999 or in 2000.  (*Id.*)  Henrob contends

that after the distribution agreement ended, Böllhoff made only cosmetic changes to the

product information it had used to sell Henrob's products, and began selling a copycat

product.  (Pl.'s Fact # 1, Böllhoff Manual, Böllhoff 09324-9353, Pl.'s Ex. 8.)  Since 2000,

Böllhoff has considered Henrob to be its primary competitor in SPR systems.

(Undisputed Fact # 1.)

At some point, Böllhoff and other riveter manufacturers began opposing, or

attacking, Henrob's patent rights, both in the United States and abroad.  (Undisputed

Fact # 2.)  In Europe, Böllhoff opposed a Henrob patent related to the '305 Patent.  (*Id.*)

The European patent survived Böllhoff's challenge, but according to Böllhoff, only after

"Henrob was forced to amend the claims to a point that they are no longer of any

─────────────────────

[2] The court conducted a hearing in this case on December 19, 2008, at which time the
court allowed counsel an opportunity to comment on this motion.  (*See* 12/15/08 Order.)

[3] Except where otherwise noted, the undisputed facts were proffered by Henrob and
admitted by Defendants.  Where a party admitted a proffered fact, but qualified it in
some way, the court has included the fact as "undisputed" to the extent that the
qualification allows.  If a party did not specifically dispute a fact, it has been accepted as
undisputed.  Where proffered facts were redundant or immaterial to the issues before
the court, the court has omitted or abridged them.

significance." (Defs.' CSMF # 2.)  At Böllhoff's request, the U.S. Patent Office

reexamined both the '305 and '127 patents in light of much of the same prior art

considered by the European Patent Office.   (Undisputed Fact # 2.)  The U.S. Patent

Office, after reexamination, confirmed the patentability of both patents, leaving both in

force.  (*Id.*)   However, Böllhoff contends that the patents were confirmed only after

Henrob amended the claims to overcome the Patent Office's objections and that Henrob

added a claim, Claim 16, during reexamination.  (CSMF # 2.)  Böllhoff secured multiple

legal opinions, from lawyers on two continents, in order to satisfy itself that it did not

infringe Henrob's patents.  (Undisputed[4] Fact # 2.)

The present litigation began when Böllhoff sued Henrob in Illinois seeking

declarations of non-infringement and invalidity of Henrob's patents as well as for unfair

competition under § 43(a) of the Lanham Act.  (Undisputed Fact # 3, Complaint, Case

No. 05C3037, Pl.'s Ex. 7.)  The Illinois court transferred Böllhoff's first-filed action

to this court.  (Undisputed Fact # 3.)  Henrob subsequently sued Böllhoff's customer,

BMW, in this court.  (*Id.*)  This court consolidated both actions.  (Dkt. 48.)

On June 7, 2006, Böllhoff filed its Third Amended Counterclaims, in which it

seeks "relief from this Court for unfair competition under Section 43 of the Lanham Act,

15 U.S.C. § 1125, stemming from Henrob's false allegations, false descriptions of facts,

and misrepresentations to others relating to Böllhoff's apparatus and method for riveting

sheet metal with a self-piercing rivet." (Undisputed Fact # 4, Countercl. IV at ¶¶ 65-71.)

---

[4]Böllhoff did not specifically dispute this fact in its response brief.  Nonetheless, in this
fact as well as throughout the court's opinion, the court has, where necessary, restated
facts in more neutral language than the argumentative terms presented by Henrob, or in
some cases, Böllhoff.

Böllhoff bases its unfair competition claim, in part, on a May 12, 2005 letter from

Henrob's outside counsel to BMW's in-house lawyers (that BMW itself requested),

stating:

> We refer to our meeting of today concerning SPR-systems.  We
> notified you formally of our client's claims that a significant number of
> BMW cars, manufactured using Böllhoff equipment and imported into the
> USA, are infringing our client's US patent 5752305.
>
> Our client has been advised to commence legal proceedings
> against you in the USA. These proceedings would include ITC
> proceedings and also willful patent infringement proceedings seeking triple
> damages and injunctions. Our client's US lawyers are ready to commence
> proceedings by July 1st 2005.
>
> We understand that you have to notify Böllhoff of any claim,
> because, according to your information, you will look to Böllhoff for a full
> indemnity in respect of your liability.
>
> Our client is willing to make an attempt to resolve these matters
> amicably with Böllhoff direct[ly].

(Undisputed Fact # 4.)  Henrob denies the unfair competition allegation.  (Undisputed

Fact # 4.)

        In March 2007, Böllhoff moved for summary judgment of non-infringement on

the '305 Patent.  (Undisputed Fact # 5.)  In November 2007, the court denied Böllhoff's

motion.  (*Id.*)

        On January 4, 2008, Henrob served Interrogatory No. 23 on Böllhoff, requesting

Böllhoff to "[s]tate each and every fact upon which you rely for support of your

assertions against Henrob based on Section 43 of the Lanham Act, and identify all

witnesses whose testimony you may rely on to support these assertions."  (Undisputed

Fact # 6.)

Böllhoff's February 15, 2008, response to Interrogatory No. 23 stated that the basis for its unfair competition claim was that "Henrob has alleged and misrepresented to Böllhoff's existing and/or prospective customers . . . that Böllhoff's Riveters and the method employed by those riveters . . . cause, or will cause, such customers to infringe the claims of the [asserted Henrob] '305 Patent and/or '127 Patent."  (Undisputed Fact # 7.)  Böllhoff further claimed that "Henrob knew, or should of [sic] known, that the claims of the '305 Patent and the '127 Patent were not infringed by Böllhoff's Riveters and Böllhoff's Riveting Method, or that the claims of the '305 Patent and '127 Patent were and are invalid and/or unenforceable and, therefore, that Henrob's allegations and misrepresentations were not 'protected,' especially considering that EP0675774 which had substantially the same claims as the claims in the '305 Patent, were found to be invalid by the European Patent Office during an opposition proceeding." (*Id.*)  The specific "existing and/or prospective customers" listed in the interrogatory response were BMW, Freightliner, Taiwan Kai Yih Industrial, Ltd., Audi, Proton, Lotus, and Volvo. (*Id.*)

On February 11, 2008, Henrob served a Rule 30(b)(6) deposition notice on Böllhoff, seeking, inter alia, testimony on Böllhoff's assertions against Henrob based on Section 43 of the Lanham Act.  (Undisputed Fact # 8.)  Böllhoff designated two witnesses, Herbert Waltz and Alwin Wedler, to testify on its behalf on Topic 29.  (*Id.*)

On March 18, 2008, Henrob deposed Mr. Waltz, one of Böllhoff's general managers, in Germany.  (Undisputed Fact # 9.)  Mr. Waltz testified that some of Henrob's acts of alleged unfair competition were communications sent to certain actual or prospective Böllhoff customers.  (*Id.*)  Testifying as Böllhoff's corporate designee on

5

the issue, Mr. Waltz stated that the only such communication of which he was aware

was a March 2006 jointly approved (by Henrob and BMW) press release relating to

Henrob's partial settlement of its claims against BMW.  (*Id.*) The press release stated in

relevant part:

> BMW Group and Henrob have reached a settlement enabling
> BMW Group to continue using certain self-pierce riveting
> equipment supplied to them by Böllhoff Systemtechnik. Henrob
> alleges that using this equipment in the United States, and in the
> sale in and/or importation into the United States of BMW's
> products manufactured using this riveting equipment, infringe its
> US Patent No. 5,752,305.

> Under the terms of the confidential settlement, Henrob has
> undertaken not to seek injunctive relief to prevent the importation of
> certain BMW Group vehicles into the United States and other countries in
> exchange for a payment from BMW Group. Henrob will continue to pursue
> its actions filed against BMW Group and Böllhoff Systemtechnik in the
> United States District Court for the Eastern District of Michigan seeking to
> establish liability and, with respect to BMW Group, past damages for
> alleged improper use of its patent prior to signing the settlement
> agreement. BMW denies any wrongdoing or liability and intends to join
> Böllhoff in defending Henrob's claims of infringement in the pending
> district court litigation.

> Henrob's CEO and Chairman, Keith Jones commented:

> "We regret having to involve BMW in this legal dispute and would
> have preferred to resolve the matter amicably with Böllhoff but
> unfortunately we were unable to do so. It is our policy to vigorously defend
> our intellectual property."

(Undisputed Fact # 9.)  Mr. Waltz testified that nothing in the March 2006 Henrob press

release was untrue.  (*Id.*, Waltz Dep. at 35:6-37:2, Pl.'s Ex. 11.)  Mr. Waltz further

admitted during his deposition that Böllhoff infringed Henrob's '127 Patent.  (Id. at

6

82:1-83:3.)[5]

On March 30, 2008, Henrob deposed Mr. Wedler, Böllhoff's other co-general manager and designee on, *inter alia*, unfair competition.  (Undisputed Fact # 10.)   Mr. Wedler testified that Böllhoff's loss of BMW business underpinned, in part, Böllhoff's unfair competition claim against Henrob.  (*Id.*)  Specifically, Mr. Wedler testified that Böllhoff lost BMW business because of the existence of the lawsuit between Böllhoff and Henrob, and that, so long as the lawsuit is pending, BMW would purchase rivets, but not riveting equipment, from Böllhoff.  (*Id.*)  Henrob attributes this lack of purchasing to a degree of adversity between Böllhoff and BMW related to this lawsuit, but Böllhoff contends that Henrob's belief is "unsupported speculation."  (Defs.' Fact # 10.) The parties agree that Wedler testified that, while BMW believes Böllhoff will indemnify it in this lawsuit, Böllhoff believes that BMW would have to sue Böllhoff in order to make good on any indemnity obligation.  (Undisputed Fact # 10.)

On May 30, 2008, the last day of the discovery period, Böllhoff supplemented its response to Interrogatory No. 23 to identify a number of documents under Fed. R. Civ. P. 33(d), and to incorporate the April 4, 2008, report submitted by Böllhoff's proffered expert, Aron Levko, on unfair competition.  (Undisputed Fact # 11.)

Mr. Levko's April 4, 2008, unfair competition report identifies five instances of

---

[5]Contrary to Böllhoff's argument, Mr. Waltz indeed admitted, as Henrob states, that Böllhoff did infringe the '127 Patent.  (Waltz Dep at 83:13, Pl.'s Ex. 11.)  Whether Waltz testified as to his personal opinion or as the Rule 30(b)(6) representative of Böllhoff can be litigated at trial.

alleged unfair competition by Henrob. (Undisputed Fact # 12.)[6] Two relate to purported loss of BMW business by Böllhoff; the other three describe alleged unfair acts by Henrob with respect to Jaguar, Freightliner, and Tong Yang Group. (*Id.*) Mr. Levko concedes that Böllhoff has not suffered any quantifiable damage resulting from Henrob's alleged unfair competition involving Jaguar, Freightliner, and Tong Yang Group. (*Id.*) He also concedes that there is no quantifiable reputation harm suffered by Böllhoff attributable to Henrob's alleged unfair competition. (*Id.*) Mr. Levko calculates that Böllhoff has suffered $73,321 in harm from Henrob's alleged unfair competition with respect to BMW.[7]

Henrob deposed Mr. Levko on his April 4, 2008 unfair competition report, on April 22, 2008. (Undisputed Fact # 13.) During that deposition, Mr. Levko explained that, in crafting his report, he assumed that any statement made by Henrob to any Böllhoff customer mentioning Henrob's patents would constitute unfair competition, because he assumed that Henrob's asserted patents were invalid or uninfringed by Böllhoff. (*Id.*) He also explained that any mention by Henrob to a Böllhoff customer of the existence of the litigation between Henrob and Böllhoff would constitute unfair competition. (*Id.*)

---

[6]Böllhoff did not dispute any portion of Henrob's proffered fact number 12. In response to this proffered fact, as well as any proffered fact which Böllhoff did not dispute, Böllhoff stated "Böllhoff does not dispute this statement, but denies it is material." The court is somewhat perplexed how Böllhoff could, in good faith, assert that the substance of its unfair competition expert report is not material to Henrob's motion on Böllhoff's unfair competition claim. Nonetheless, since Böllhoff does not dispute Henrob's summarization of the report, the court accepts it.

[7]It bears mention only in passing that Böllhoff paid Mr. Levko approximately $85,000 in order to reach this conclusion. (*Id.*)

8

The patent application that became the '305 patent was filed with the US Patent Office on March 1, 1996. (Undisputed Fact # 14.)[8] The application claimed priority to a patent application Henrob filed earlier in the United Kingdom on December 19, 1992. (*Id.*) The '305 patent is titled "Self-Piercing Riveting Method and Apparatus," and issued on May 19, 1998. (*Id.*)

In October 1992, the article titled "Pierce-&-Roll Riveting – The Alternative to Spot-Welding," was published in the October/November 1992 edition of the publicly available magazine called Aluminium Industry (the "AI Article"). (Undisputed Fact # 15.) Since the AI Article was published before the December 19, 1992 earliest priority date of the '305 patent, the AI Article is prior art to the '305 patent under 35 U.S.C. § 102(a). (*Id.*)

The AI Article discloses a self-pierce riveting machine for, and a method of self-pierce riveting, "together two or more sheets of material without need for a pre-pierced hole, but can do it in such a way that the rivet never breaks through the lower sheet." (Undisputed Fact # 16, quoting the AI Article at 24, Defs.' Ex. 34.) The self-pierce rivet shown in the AI Article has a tapered end and "is designed to pierce the upper sheet and to begin rolling immediately [after] it enters the lower sheet." (Undisputed Fact # 17, quoting the AI Article at 24, Defs.' Ex. 34.)

The AI Article discloses that the self-pierce rivet is inserted so "that the rivet never breaks through the lower sheet." (Undisputed Fact # 18, quoting the AI Article at 24, Defs.' Ex. 34.)

---

[8]The remainder of the facts were proffered by Böllhoff and were, unless otherwise noted, substantively undisputed by Henrob.

On October 22, 1992, Roger Doo, an employee at Henrob, faxed a copy of the AI Article to Gert Ahlers-Hesterman, an employee at Böllhoff.  (Undisputed Fact # 19.)

Keith Jones, CEO of Henrob, indicated in a fax that he doubted Henrob's ability to obtain any patent protection for Henrob's pre-clamping riveter because of prior art.  (Undisputed Fact # 20.)  While Henrob does not dispute this characterization, Henrob disputes that the referenced prior art included the AI Article.  (Pl.'s Reply Fact # 21.)  Henrob also asserts that the statement was made in reference to the European patent application, not the U.S. Patent application.  (*Id.*)

The AI Article was not cited by Henrob to the PTO during the prosecution of the application that became the '305 patent.  (Undisputed Fact # 21.)

In 1999 and 2000, Böllhoff obtained opinions from patent counsel that the claims of the '305 patent were either invalid or not infringed by the Böllhoff SPR machine and by Böllhoff's customers that use the Böllhoff SPR machine.  (Undisputed Fact # 22.)  These opinions of counsel opined, in part, that the claims of the '305 patent are invalid over the AI Article.  (*Id.*)

Böllhoff asserts that in 2001, based on an opposition proceeding initiated by Böllhoff and others, the European Patent Office rejected Henrob's claims in EPO patent no. 0675774, which was Henrob's EPO patent corresponding to the '305 patent.  (Defs.' Fact # 23.)  Böllhoff contends that, after the EPO rejected the claims of Henrob's EPO patent over the AI Article, Henrob amended the claims to overcome the EPO's rejection to a point that the claims are wholly irrelevant to the accused Böllhoff Riveters.  (*Id.*)  Henrob disputes that the claims were made "wholly irrelevant" and instead asserts that

10

they "exist in a form such that they may be asserted against Böllhoff products." (Pl.'s Reply Fact # 23.)

In March 2003, Böllhoff asked the U.S. Patent Office to reexamine the claims of the '305 patent. (Undisputed Fact # 24.) On May 30, 2003, the Patent Office ordered a reexamination of the claims that issued in the '305 patent, based on prior art that had not been considered by the Patent Office during the original prosecution of the '305 patent, because such prior art, and particularly the AI Article, raised "a substantial new question of patentability affecting claims 1-15 of the '305 patent. (*Id.*)

In a first office action dated December 19, 2003, the Patent Office rejected method claims 1-2 and machine claims 9 and 10 as being unpatentable over the AI Article under 35 U.S.C. § 102(a). (Undisputed Fact # 25.)[9] The Patent Office determined that the AI Article disclosed each limitation found in those rejected claims. (*Id.*)

In response to the December 19, 2003, office action, on February 19, 2004, Henrob filed Response A, wherein Henrob made further arguments regarding the the AI Article and the '305 Patent. (Defs.' Fact # 26, Pl.'s Reply Fact # 26.)

In a May 11, 2004, office action, the Patent Office again rejected method claims 1 and 2 over the AI Article, noting that:

> [I]t is inherent that the spring pre-clamping disclosed by the [AI Article] provide[s] some degree of force sufficiently substantial to prevent the sheet material from being drawn laterally inwards towards the rivet as the

---

[9]While Henrob quibbles over some of the characterizations set forth in fact number 25, the substance of the fact is fundamentally undisputed. Moreover, any slight disputes are not material to the issues presented in this motion.

11

rivet is driven into the sheets.  ('305 Reexam. History, Defs.' Ex. 30, at HEN000648.)

Appendix B [submitted with Response A] also shows that clamping force, for either hydraulic or spring pre-clamping, reaches a constant maximum during the actual rivet driving operation, which is a major part of the riveting operation.  ('305 Reexam. History, Defs.' Ex. 30, p. HEN000649.)

(Undisputed Fact # 27.)

On August 11, 2004, Henrob filed Amendment B, where it amended method

claim 1 as follows (deletions are in brackets and additions are underlined):

c) clamping the sheets together before the rivet is driven into the first sheet with a clamping force applied immediately adjacent the rivet, the clamping force being [sufficiently substantial] <u>sufficient</u> to prevent sheet material from being drawn laterally inwards towards the rivets as the rivet is driven into the sheets, <u>said clamping force being larger than a clamping force merely required to hold said sheets against each in other in a generally non-moving relation</u>; . . .

(Undisputed Fact # 28.)

On September 10, 2004, Henrob filed Amendment C where it added new claim

16.  (Undisputed Fact # 29.)

After Henrob submitted Response A, and Amendments B and C, the Patent

Office decided that the claims were allowable.  (Undisputed Fact # 30.)

In the Reasons for Patentability/Confirmation, the Patent Office stated:

As discussed in the Declaration of Roger Stanton Doo dated February 23, 2004, the clamping force of the prior art device apparently only prevents the sheets from slipping with respect to each other. By providing a greater clamping force than the prior art, the instant invention is capable of providing a clamping force sufficient to prevent sheet material from being drawn laterally inwards towards the rivet as the rivet is driven into the sheet. There is no teaching or suggestion in the prior art of record to provide a clamping force sufficient to prevent sheet material from being drawn laterally inwards towards the rivet as the rivet is driven into the sheet.

12

(Undisputed Fact # 31.)

As part of Response A, Henrob submitted a declaration to the Patent Office by

Mr. Doo, in which he represented to the Patent Office the differences between the prior

art disclosed in the AI Article, and the claimed riveter and method (the "Doo

Declaration").  (Undisputed Fact # 32.)

In his Declaration, Mr. Doo stated:

> I have read and understand the content of the following referenced
> cited by the United States Patent Office: "Aluminium Industry, Pierce &
> Roll riveting– the alternative to spot-welding" (Vol. 11, No. 5, pages 24-26)
> by Kenneth Edwards, published 19th November 1992.  (Doo Declaration,
> Defs.' Ex. 37, ¶ 3);
>
> I was responsible for organizing tests to compare the results of
> riveting processes using our pre-clamping invention with a spring clamping
> technique that was prevalent in the riveting of aluminum sheet material at
> the time the above cited reference [AI Article] was published. I believe that
> the equipment described in the [AI Article] used conventional spring
> clamping as there is no suggestion in the text that hydraulic clamping was
> used and the figures only show a single hydraulic cylinder and an
> associated pair of hoses for advancing and retracting the rivet insertion
> actuator and punch.  (Doo Declaration, Defs.' Ex. 37, ¶ 4);
>
> The photographs of Exhibit 1 attached to this declaration show the
> results of a first test conducted. The photograph annotated "hydraulic
> pre-clamping" shows the results of insertion of a rivet using the
> preclamping invention method and apparatus described in our
> aforementioned patent application. The photograph annotated "spring
> pre-clamping" shows a riveted joint that was made with a hydraulically
> operated actuator of the kind described in the cited reference [AI Article]
> referred to in paragraph 3 with the clamping force being applied with a
> spring within the tool. Both joints are made from the same sheet material.
> The material coupons for the upper sheets were cut from the same sheet
> of aluminum material – 1.2 mm thick NG5754, as were the lower sheets –
> 2.5 mm thick NG5754.  (Doo Declaration, Defs.' Ex. 37, ¶ 5.)

(Undisputed Fact # 33.)

For the tests of the spring pre-clamping riveter described in the Doo Declaration,

Mr. Doo concluded, "It can be seen that there is lateral movement of the rolling marks in the region around rivet insertion. This movement has been measured at 0.3 mm. Relative to the size of the joint this is significant as it is 11.3 % of the rivet shank radius."  (Undisputed Fact # 34.)

For the tests of the claimed hydraulic pre-clamping riveter described in the Doo Declaration, Mr. Doo concluded:

> The use of different rivet and die combinations for different material combinations is well known and does not override the effect that the pre-clamping process will always produce a joint with insignificant lateral draw compared to that on the same joint made without the pre-clamping process. The clamping force applied was 6.8 kN. The same red line is displayed as for the other photograph [for the joint made with the spring pre-clamping riveter].  It can be seen that there is no significant discernable movement of the sheet material.

(Undisputed Fact # 35.)  The photographs submitted by Mr. Doo to represent the amount of material flow that occurs with the claimed Henrob Pre-clamping riveter and the prior art spring pre-clamping riveter only showed the top of the riveted joints. (Undisputed Fact # 36.)

The tests discussed in the Doo Declaration related to the Henrob Pre-clamping Riveter, were made using a Henrob riveter, rivet and die using Henrob's best available technology from 2003, not from 1992.  (Undisputed Fact # 37.)

Defendants contend, but Henrob disputes, that the test data submitted to the PTO in the Doo Declaration established 0.30 mm of Material Flow as a "benchmark" for the prior art riveter and riveting method taught in the AI Article.  (Defs.' Fact # 38, Pl.'s Reply Fact # 38.)

In March and April 2008, Defendants' self-pierce riveting expert, Andrew

14

MacDonald, conducted tests on what Defendants assert, but Henrob disputes, is the prior art Spring Pre-clamping riveter disclosed in the AI Article. (Defs.' Fact # 39, Pl.'s Reply Fact # 39.) For his tests, Mr. MacDonald riveted two sheets of Aluminum NG5754, with the top sheet having a thickness of 1.2 mm and the bottom sheet having a thickness of 2.5 mm, which is the same type and thicknesses of aluminum material used in the tests reported by Henrob to the Patent Office in the Doo Declaration. (Undisputed Fact # 40.)

The parties agree that differences exist between Mr. MacDonald's tests and the tests discussed in the Doo Declaration. (Undisputed Fact # 41.) Defendants contend that this is because Mr. MacDonald used a rivet and die combination that was identical to the rivet and die combination disclosed in the AI Article, but Henrob argues that there are no parameters disclosed in the AI Article to allow Defendants, or Mr. MacDonald to make such a contention. (Defs.' Fact # 41, Pl.'s Reply Fact # 41.)

The die that Mr. Doo used for his tests of the spring pre-clamping riveter (die type D10-230) has a die cavity that Defendants claim (but Henrob disputes) is "very deep" and has a volume of 274.3 cubic millimeters, whereas the die that Mr. Doo used for his tests of the Henrob hydraulic pre-clamping riveter (die type DZ9-000), has a die cavity volume of 88 cubic millimeters. (Defs.' Fact # 42, Pl.'s Reply Fact # 42.)

The rivet that Mr. Doo used for his tests of the spring pre-clamping riveter (rivet type R50644C) has a flat, blunt-end, whereas the rivet that Mr. Doo used for his tests of the Henrob hydraulic pre-clamping riveter (rivet type K50742C) has a tapered end. (Undisputed Fact # 43.)

There are no cross sectional photographs of Mr. Doo's tests within the Doo

Declaration to determine how good the joint quality was. (Undisputed Fact # 44.) Mr. MacDonald attempted to reproduce the joints of Mr. Doo's tests based on the information provided in the Doo Declaration. (*Id.*)

According to Defendants, a die cavity that is too deep results in the rivet being pushed too deeply into the sheets of material and also causes more sheet material to move inwardly towards the rivet. (Defs.' Fact # 45, Declaration of Andrew MacDonald, Defs.' Ex. 40, ¶ 34.) Henrob contends, however, that in a variety of joints the crticical inquiry is a correct head height, which may result in circumstances with a deeper die cavity. (Pl.'s Reply Fact # 45.)

Defendants assert, and Henrob disputes, that the rivet and die combination selected by Mr. Doo for his spring pre-clamping riveter tests (representing the riveter disclosed in the AI Article) was inappropriate and caused the rivet to be pushed so deeply into the sheet material that the rivet actually broke-through the back surface of the bottom sheet of material, which is not an acceptable self-pierce riveted joint. (Defs.' Fact # 46.)

The rivet and die combination selected by Mr. Doo for his hydraulic pre-clamping riveter tests (representing the riveter claimed in the '305 patent) produced an acceptable riveted joint and did not break through the back surface of the bottom sheet of material. (Undisputed Fact # 47.)

Mr. MacDonald reported the test results of his tests of March 20, 2008, and April 2, 2008, in his Lab Report and an expert report submitted on April 4, 2008. (Undisputed Fact # 48.)

16

The spring clamping force used by Mr. MacDonald with the tested Spring Pre-clamping riveter was 180 N.  (Undisputed Fact # 49.)

For the tests of April 2, 2008, Defendants claim that Mr. MacDonald tested the prior art Spring Pre-clamping riveter using a "proper" prior art rivet (the same type of rivet shown in the AI Article) and a "proper" prior art die (the same type of die shown in the AI Article).  (Defs.' Fact # 50.)  Henrob disputes this contention, arguing that Mr. MacDonald did not test the same type of riveter disclosed in the AI Article, and indeed there is no evidence that such a riveter ever physically existed.  (Pl.'s Reply Fact # 50.)  Henrob also argues that the tested Böllhoff riveter is not prior art.  (*Id.*)

For the April 2, 2008, tests, the Spring Pre-clamping riveter produced riveted joints that resulted in inward, lateral material flow of, on average, 0.04 mm., which Defendants claim is "negligible, not visually discernible," and can only be measured by a high-powered optical microscope.  (Defs.' Fact # 51.)   Henrob contends that 0.04 mm is not "negligible."  (Pl.'s Reply Fact # 51.)  Based on his test results of the prior art Spring Pre-clamping riveter, Mr. MacDonald concluded that:

> the claim element in claims 1 and 16 that "the clamping force being sufficient to prevent sheet material from being drawn laterally inwards toward the rivet as the rivet is being drawn into the sheets," as construed by the Court, is inherently present in the riveting method disclosed in the AI Article, as the AI Article clearly discloses a preclamping self-pierce riveting method and apparatus, which, according to Mr. Doo, is a Dual Action riveter, that applies a preclamping force that is sufficient "to prevent sheet material from being drawn laterally inwards toward the rivet as the rivet is being drawn into the sheets," as construed by the Court. (Declaration of Andrew MacDonald, Appdx. Ex. 40, ¶ 114).

(Undisputed Fact # 52.)

17

In April 2008, after Mr. MacDonald performed the tests described above and submitted his expert report disclosing his test results, employees of Henrob performed the same tests conducted by Mr. MacDonald.  (Undisputed Fact # 53.)  However, Henrob submits that Henrob employees conducted additional tests as well.  (Pl.'s Reply Fact # 52.)

Henrob's employees riveted the same types and thicknesses of sheet material that Mr. MacDonald used, and Mr. Doo used for the tests disclosed in the Doo Declaration, using the same type of rivet and die used by Mr. MacDonald.  (Undisputed Fact # 54.)

These replicated tests by Henrob's own employees determined that there was an average of 0.056 mm of inward, lateral material flow.  (Undisputed Fact # 55.)  The riveted joints produced by Henrob's employees did not break-through the bottom sheet of material.  (*Id.*)

On August 18, 2003, Henrob sent a letter to Jaguar Cars Ltd., which states, in relevant part,

> Henrob has two main competitors–Emhart and Bollhoff.  In the case of Emhart, I believe both companies have demonstrated how to act maturely to their, and their customers', mutual benefit.  Henrob is not opposed to expanding the market and Emhart respects its intellectual property rights.  This, quite rightly, does not stop us fighting like cat and dog in the market!  There are no disputes with Enhart regarding patent infringements.
>
> Unfortunately, the relationship with Bollhoff is not good.  Henrob's decision to dismiss them as its European distributor has no doubt contributed to this situation, however, the German automotive industry encourage Henrob to deal with it direct[ly].  As illustrated above, Henrob has clear and substantial patent issues with Bollhoff.

(Defs.' Fact # 56, Defs.' Ex. 43.)

Böllhoff contends, but Henrob disputes, that Henrob never informed Böllhoff that Henrob believed Böllhoff's riveters infringe Henrob's patents.  (Defs.' Fact # 57, Pl.'s Reply Fact # 57.)

According to Böllhoff, before the distribution agreement ended, Böllhoff developed its own self-pierce riveters.  (Defs.' Fact # 58.)

On March 15, 2005, Henrob's patent counsel in Germany contacted the BMW AG legal department to inform BMW AG that it was Henrob's position that Böllhoff had infringed the '305 patent through its sale of machines to BMW AG.  (Undisputed Fact # 59.)  There followed an exchange of correspondence between Henrob's German counsel and BMW AG in an effort to set up a meeting. The correspondence included an e-mail on April 5, 2005, from Henrob's counsel to BMW AG asserting that BMW AG had infringed the '305 patent by allegedly importing into the United States cars assembled with SPR machines purchased from Böllhoff.  (*Id.*)

On May 11, 2005, representatives of BMW AG and Henrob held the meeting that they had previously been trying to organize.  (Undisputed Fact # 60.)  At the meeting, Josef Dirscherl of BMW AG told the Henrob representatives that in the time period since Henrob's April 5, 2005, e-mail, BMW AG had moved quickly to cancel existing plans to purchase new Böllhoff SPR machines in an effort to ensure any intellectual property rights of Henrob were being respected.  (*Id.*)  Mr. Dirscherl also explained the need for BMW AG to bring Henrob's allegations against BMW AG to Böllhoff's attention. He asked for a letter that he could pass on to Böllhoff.  (*Id.*)  Henrob provided this letter to BMW AG on May 12, 2005. The letter contained Henrob's "formal notification" to BMW AG that BMW cars manufactured using Böllhoff SPR machines

19

and purportedly imported into the United States were allegedly infringing the '305 patent and that legal proceedings in the United States against BMW AG were being contemplated.  (*Id.*)

On May 12, 2005, Henrob sent a letter to BMW accusing BMW of patent infringement through BMW's purchase and use of Böllhoff's riveters to manufacture automobiles that are imported into the United States.  (Undisputed Fact # 61.)  In this letter, Henrob threatened BMW that it would initiate legal proceedings against BMW, including an ITC proceeding.  (*Id.*)

Defendants assert that Henrob never conducted any tests of a Böllhoff SPR machine to ascertain if it infringed any claims until after Böllhoff commenced this lawsuit, and that the first time that Henrob made any test of the Böllhoff riveter was after Defendants' filed their motion for summary judgment of noninfringement in March 2007. (Defs.' Fact # 62.)

Defendants further contend, and Henrob disputes, that even though it threatened many of Böllhoff's customers with legal proceedings, Henrob never intended to initiate any legal proceedings.  (Defs.' Fact # 63.)  Instead, Henrob claims that it did not need to initiate a suit against Böllhoff because Böllhoff first sued Henrob.  (Pl.'s Reply Fact # 63.)  Henrob also points out that it did, in fact, sue the BMW Defendants.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-

20

moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

### III. DISCUSSION

To sustain a claim for unfair competition under § 43(a) of the Lanham Act, Böllhoff must show:

(1) Henrob made false or misleading statements of fact concerning its product or another's;

(2) the statement actually or tends to deceive a substantial portion of the intended audience;

(3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions;

(4) the statement was introduced into interstate commerce; and

(5) there is some causal link between the challenged statements and harm to Böllhoff.

*See Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001). Additionally, the Federal Circuit has held that "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith." *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). "This prerequisite is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith." *Id.* (citations omitted).

### A.  A Prima Facie Case Under § 43(a)

Henrob first argues that Böllhoff cannot establish a prima facie case of unfair competition under the Lanham Act. The court agrees.

First, as a procedural matter, in moving for summary judgment, Henrob specifically argued, with appropriate factual and legal citations, that the statements on which Böllhoff relies are not false or misleading. (*See* Pl.'s Mot. at 6-7.) The burden then shifts to Böllhoff, which must put forth enough evidence to show that there exists a

22

genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  However, in Böllhoff's response brief, it merely recites the applicable standard and states that "[i]t is undisputed that Böllhoff presented evidence satisfying each of these elements and, therefore, established a prima facie case of unfair competition under Section 43(a) of the Lanham Act against Henrob."  (Defs.' Br. at 13-14.)  Böllhoff makes no attempt to specifically articulate why any of the challenged statements are false or misleading.  It is simply not enough for Böllhoff to set forth sixty-three statements of fact, without explaining how those facts entitle it to a jury trial on unfair competition.  In the absence of any *argument* presented supporting the concept that the statements made were false or misleading –or even specifically identifying such statements– the court cannot find a genuine issue on this prong of the prima facie case, and Henrob's motion must be granted on this basis.  There is no duty imposed upon the trial court to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1480 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir. 1988)); *see also InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989) (holding that the district court is not required to speculate on which portion of the record the non-moving party relies, nor is court obligated to "wade through" the record for specific facts); *Gaines-Tabb v. ICI Explosives, USA, Inc.,* 160 F.3d 613, 623-24 (10th Cir. 1998) ("A[n appellate] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record.") (citation omitted).

Here, Böllhoff has failed to show sufficient evidence to proceed to a jury on this question.  Böllhoff relies, in part, on the May 12, 2005, letter in which Henrob formally

23

informed BMW of its "claim" that BMW's activities constituted infringement of Henrob's intellectual property rights. (Undisputed Fact # 4.)  Nothing in the letter is, in itself, demonstrably false inasmuch as it details only Henrob's "claim." A claim is a statement of opinion, not a fact.  *See American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) ("[A] Lanham Act claim must be based upon a statement of fact, not of opinion.") (citing *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995), *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F.Supp. 115, 136 (D. Mass. 1996)).  Similarly, the March 2006 press release also details objective facts regarding Henrob's allegations and the settlement of a portion of its claims against BMW.  (Undisputed Fact # 9.) Böllhoff's representative, Mr. Waltz, testified that nothing in the March 2006 Henrob press release was untrue.  (*Id.*, Waltz Dep. at 35:6-37:2, Pl.'s Ex. 11.)  Thus, Böllhoff cannot rely on either of these two communications to establish its unfair competition claim, because the two communications do not meet the first prong of § 43(a), that the statements are false or misleading.

Böllhoff appears to rely on other statements, but it is not possible for the court to analyze them because Böllhoff has failed to specifically identify the statements in response to Henrob's motion for summary judgment.  While Böllhoff complains, generally, of misrepresentations or threats which it says Henrob made to Böllhoff's customers, it has specifically identified only one other communication for this proposition: Böllhoff points to an August 18, 2003, letter which Henrob sent to Jaguar Cars Ltd.  (Defs.' Fact # 56.)  The letter states, in part:,

24

Henrob has two main competitors–Emhart and Bollhoff.  In the case of Emhart, I believe both companies have demonstrated how to act maturely to their, and their customers', mutual benefit.  Henrob is not opposed to expanding the market and Emhart respects its intellectual property rights.  This, quite rightly, does not stop us fighting like cat and dog in the market!  There are no disputes with Enhart regarding patent infringements.

Unfortunately, the relationship with Bollhoff is not good.  Henrob's decision to dismiss them as its European distributor has no doubt contributed to this situation, however, the German automotive industry encourage Henrob to deal with it direct[ly].  As illustrated above, Henrob has clear and substantial patent issues with Bollhoff.

 (Defs.' Fact # 56, Defs.' Ex. 43.)  However, other than cite to the letter in its proposed

facts, Böllhoff makes no attempt to explain how this letter constitutes a false or

misleading statement.  The letter states that the relationship between Henrob and its

competitor Böllhoff is "not good" and that Henrob has patent "issues" with Böllhoff, but

the letter itself makes no direct allegation regarding Böllhoff's activities.

Moreover, even if Böllhoff could establish a triable issue that this, or any other

communication, was misleading, it has failed to show any triable issue of fact relating to

the fifth prong of liability under the Lanham Act, which requires a causal connection

between the challenged statement and any resultant damages allegedly suffered by

Böllhoff.  Instead, Böllhoff's damages expert stated that Böllhoff has not suffered any

quantifiable damage resulting from Henrob's alleged unfair competition involving

Jaguar, Freightliner, and Tong Yang Group.  (Undisputed Fact # 12.)  Additionally,

Henrob has produced evidence that Jaguar itself conducted an independent

investigation into Böllhoff's equipment and determined that its opinion was that "the

Böllhoff method . . . was close enough to the Henrob patents for Jaguar to expose itself

to a significant risk should it be decided to use Böllhoff's equipment."  (Pl.'s Reply at 4.)

25

Accordingly, the evidence before the court reveals no genuine dispute with the assertion that any decision by Jaguar to avoid Böllhoff was unrelated to the August 2003 letter.

For these reasons, the court finds that Böllhoff has failed to meet its burden of showing sufficient evidence on which a reasonable jury could find that Böllhoff had established a prima facie case of unfair competition, and that Henrob's motion should be granted.

### B. Bad Faith

As stated above, in addition to establishing a prima facie case under § 43(a), Böllhoff must also show that the objectionable marketplace activity was undertaken in bad faith. *Zenith,* 182 F.3d at 1353.

> Exactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out.

*Id.* at 1355. Even if Böllhoff could establish a prima facie case under § 43(a), the court finds that Böllhoff has failed to show a triable issue of fact that Henrob undertook any of its actions in "bad faith." Böllhoff claims that Henrob made false statements in the marketplace that Böllhoff's activities infringed Henrob's patents, but that Henrob's statements were objectively baseless because Henrob's patents are invalid or unenforceable. Böllhoff also argues that Henrob made these statements with no intent to initiate patent infringement lawsuits against its customers.

> In general, "federal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999) (quoting *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed. Cir.

26

> 1998). "[A] patent owner has the right to . . . enforce its patent, and that
> includes threatening alleged infringers with suit." *Concrete Unlimited, Inc.*
> *v. Cementcraft, Inc.*, 776 F.2d 1537, 1538 (Fed. Cir. 1985).

*Golan v. Pingel Enterprise, Inc.*, 310 F.3d 1360, 1370 (Fed. Cir. 2002).  Moreover, "[t]he

law recognizes a presumption that the assertion of a duly granted patent is made in

good faith, *see Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37-38 (1913); this

presumption is overcome only by affirmative evidence of bad faith." *Id.* at 1371 (quoting

*C.R. Bard Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998)).  "Bad faith

includes separate objective and subjective components." *Dominant Semiconductors*

*SDN. BHD. v. Osram GMBH*, 524 F.3d 1254, 1260 (Fed. Cir.  2008) (citing *Mikohn*

*Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998)).  The Federal

Circuit has held that bad faith cannot be found "in the absence of a showing that the

claims asserted were objectively baseless." *Id.*  (quoting *Globetrotter Software, Inc. v.*

*Elan Computer Group, Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004)).   "To be objectively

baseless, the infringement allegations must be such that 'no reasonable litigant could

reasonably expect success on the merits.'" *Id.* (quoting *GP Indus., Inc. v. Eran Indus.,*

*Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007)).  As the Federal Circuit has explained:

> [P]atentees do not violate the rules of fair competition by making accurate
> representations, and are allowed to make representations that turn out to
> be inaccurate provided they make them in good faith. *See Mallinckrodt,*
> *Inc. v. Medipart, Inc.*, 976 F.2d 700, 710 (Fed. Cir. 1992). Nevertheless, if
> the party challenging such statements under state or federal law presents
> clear and convincing evidence that the infringement allegations are
> objectively false, and that the patentee made them in bad faith, viz., with
> knowledge of their incorrectness or falsity, or disregard for either, the
> statements are actionable and are not protected by the existence of a
> patent.  *To survive summary judgment, the party challenging such*
> *statements must present affirmative evidence sufficient for a reasonable*
> *jury to conclude that the patentee acted in bad faith, in light of the burden*
> *of clear and convincing evidence that will adhere at trial.*

27

*Golan v. Pingel Enterprise, Inc.*,  310 F.3d 1360, 1371 (Fed. Cir. 2002) (emphasis
added).

Here, the court agrees with Henrob that Böllhoff cannot meet its burden to show
that no reasonable litigant could reasonably expect success on the merits of Henrob's
infringement claim.  *Dominant Semiconductors*, 524 F.3d at 1260.  The court has
already denied Böllhoff's motions for summary judgment of noninfringement and
invalidity.  The denial of these motions demonstrates that, in fact, a reasonable litigant
could expect success on Henrob's claims.  *See Globetrotter Software*, 362 F.3d at 1375
(stating that reversal of a grant of summary judgment of infringement "amply
demonstrated" that the claims of infringement were not objectively baseless).

Nor is the court persuaded that Böllhoff's inequitable conduct allegations
constitute sufficient "affirmative evidence" for the jury to conclude that Henrob's claims
of infringement were objectively baseless.  In response to Henrob's well-supported
motion for summary judgment, Böllhoff has itself barely articulated its inequitable
conduct defense.  Instead, Böllhoff's response brief rests primarily, if not exclusively, on
the alleged strength of its invalidity summary judgment motion.  Since the time that
Böllhoff filed its response brief, however, the court has denied its summary judgment
motion, holding that a reasonable jury could find that Böllhoff had not met its burden to
establish that the '305 Patent is invalid.  Within that opinion, the court analyzed the
reports of Henrob's and Böllhoff's competing experts.  In light of those reports and
opinions, the court found that it was for the jury to determine which expert, if either,
upon which to rely.  Based on Böllhoff's limited articulation of the inequitable conduct

28

defense, the court finds that resolution of that issue will proceed along a similar path.  It is, essentially, a matter of choosing which expert to believe.  Under such circumstances, the court is not persuaded that Böllhoff has "affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial."  *Golan*,  310 F.3d at 1371.

That a jury might ultimately agree with Böllhoff's arguments relating to noninfringement, invalidity or inequitable conduct does not mean that it has offered sufficient evidence to survive Henrob's summary judgment motion on unfair competition. Böllhoff has not shown that it can "offer clear and convincing evidence that [Henrob] had no reasonable basis to believe that [Böllhoff] infringed [Henrob's] patents or that [Henrob] knew it was enforcing an . . . unenforceable . . . patent."  *Id.* at 1371.  Böllhoff has not shown sufficient evidence to establish that Henrob pursued claims "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Dominant Semiconductors*, 524 F.3d at 1261 (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 62 (1993)).  Based on the pleadings before the court, at most, Böllhoff has shown that it *might* prove its inequitable conduct defense.  However, the evidence before the court also suggests that Henrob may succeed on this issue.  As such, Böllhoff cannot prevail on its unfair competition claim.

Morever, the court is not persuaded by Böllhoff's claim that Henrob acted in bad faith because it never intended to initiate an action against its competitors.  Böllhoff has produced no actual evidence that Henrob did not "intend" to initiate proceedings against its customers.  The court agrees with Henrob that this claim is refuted by the fact that Henrob, in fact, asserted infringement claims against BMW and Böllhoff.  Nonetheless,

29

even if Böllhoff could support this claim, the court finds this allegation is not dispositive

to the issue of bad faith.  "[A] decision not to sue one's own customers is not particularly

probative of bad faith conduct."  *Golan*, 310 F.3d at 1370 n.5.  Thus, "[w]hile notifying

infringers without intending to file suit may be an example of bad faith . . . it is not

dispositive."  *Id.* (internal citation omitted).  The *Golan* court elaborated that:

> The decision to initiate a lawsuit often includes business-related
> considerations. For example, a patentee might have a good faith belief
> that a competitor's product infringes the patent but, for business-related
> reasons, determines the financial cost of enforcing the patent outweighs
> the recoverable damages. In such a circumstance, a patentee may elect
> to attempt to enforce the patent-for example by aggressively asserting its
> patent rights-and never intend to file suit. This conduct is authorized under
> the patent laws in the absence of falsity or incorrectness, or disregard for
> either. *See Mikohn,* 165 F.3d at 897.  Indeed, such conduct is commonly
> the first step taken to enforce one's patent rights. Thus, even if Pingel
> never intended to file suit, we believe this is only a factor to consider in
> determining whether the enforcement of a patent is in bad faith.

*Id.* at 1372.  Here, as in *Golan*, the court finds that the only record evidence that Henrob

never actually intended to file suit is based on an inference, but that this inference alone

is not sufficient to allow Böllhoff to proceed to a jury.  *Id.* ("Since the intention to file suit

is only one factor in determining bad faith, and the only evidence in the record that

Pingel did not intend to file suit against Golan is based on an inference, we do not

believe a reasonably jury could find that Pingel acted in bad faith in light of Golan's clear

and convincing evidentiary burden.").

Finally, Böllhoff cannot rely on Henrob's subjective intent to show objective

baselessness.  As the Federal Circuit stated in *Dominant Semiconductors*:

> Dominant's contentions might be probative of subjective baselessness,
> but they do not help to show that a jury reasonably could find that
> Dominant could meet its burden of proving by clear and convincing
> evidence that OSRAM's infringement allegations were objectively

30

baseless.  In GP Industries, we stated that "[s]ubjective considerations of bad faith are irrelevant if the [challenged] assertions are not objectively baseless." 500 F.3d at 1375 (citing *Prof' l Real Estate*, 508 U.S. at 60, 113 S.Ct. 1920).  We found in that case that the trial court's analysis of bad faith had "encompassed subjective considerations and unconvincing objective factors." *Id.*  We stated, for example, that the fact that the accused party "did not show that any expert advice or opinions were sought before [it] made the allegations of infringement" was "not [a] convincing objective factor."  *Id.*

*Dominant Semiconductors,* 524 F.3d at 1263-64.  Thus, Böllhoff's arguments that

Henrob did not conduct sufficient tests to determine infringement before making its

alleged statements cannot help Böllhoff to show objective baselessness.

Böllhoff has failed to provide the court with sufficient evidence to survive

Henrob's summary judgment motion.  The fact that the court has held that a reasonable

jury could find Henrob's patents valid and could also find that Böllhoff infringes those

patents effectively disposes of Böllhoff's unfair competition claim.  *See Dominant*

*Semiconductors,* 524 F.3d at 1264 ("In the face of OSRAM's evidence showing that the

ALJ had held that a trial was necessary to determine whether Dominant infringed most

of the patents referenced in the Schachtner Letter, and that the ALJ later found

infringement as to one of those patents, Dominant produced no evidence of objective

baselessness at all-in other words, it produced no evidence that Schachtner's claims of

infringement were factually unsound.").  Böllhoff has not produced sufficient affirmative

evidence to demonstrate that "no reasonable litigant could realistically expect success

on the merits."  *Globetrotter Software*, 362 F.3d at 1376 (quoting *Real Estate*, 508 U.S.

at 60).  The court finds that the only conclusion a jury could reach based on the record

before the court is that "an objective litigant could conclude that the suit is reasonably

calculated to elicit a favorable outcome," and as such, this case is not objectively baseless as a matter of law.

Henrob's motion will therefore be granted.

### IV. CONCLUSION

For the reasons stated above, IT IS ORDERED that Henrob's motion for summary judgment with respect to the Böllhoff Defendants' claim for unfair competition [Dkt. # 238] is GRANTED.


      S/Robert H. Cleland               
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2009, by electronic and/or ordinary mail.


      S/Lisa Wagner                  
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\05-73214.HENROB.UnfairCompetition.SJ.2.wpd